IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RYANN TILLMAN,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:23cv1585 |
| | ) | **Electronic Filing** |
| **XPO LOGISTICS FREIGHT, INC.**, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION**

Ryann Tillman ("plaintiff") commenced this action against XPO Logistics Freight, Inc. ("defendant" or "XPO"), seeking redress for a hostile work environment and retaliation under Title VII and the Pennsylvania Human Relations Act ("PHRA"). Presently before the court is defendant's motion for summary judgment. For the reasons set forth below, the motion will be denied.

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(A). Rule 56 "'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)). Deciding a summary judgment motion requires the court to view the facts, draw all reasonable inferences and resolve all doubts in favor of the nonmoving party. Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim. Nat'l State Bank v. Fed. Reserve Bank of New York, 979 F.2d 1579, 1581-82 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting FED. R. CIV. P. 56(E)) (emphasis in Matsushita). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" ... "and cannot simply reassert factually unsupported allegations." Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989). Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs." Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992); Sec. & Exch. Comm'n v. Bonastia, 614 F.2d 908, 914 (3d Cir. 1980) ("[L]egal conclusions, unsupported by documentation of specific facts, are insufficient to create issues of material fact that would preclude summary judgment."). Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion. Robertson v. Allied Signal, Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990). If the non-moving party's evidence is merely colorable or lacks sufficient probative force summary

judgment may be granted. Anderson, 477 U.S. at 249-50; see also Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993) (although the court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

The record as read in the light most favorable to plaintiff establishes the background set forth below. Defendant is a large national trucking company. Plaintiff is a young adult female who was hired by defendant on February 25, 2020, as a Driver Sales Representative ("DSR") at its Pittsburgh, Pennsylvania location. As a DSR, plaintiff was responsible for operating a tractor-trailer combination. She also was responsible for generating sales leads and loading and unloading freight at delivery locations and XPO terminals.

Defendant requires all DSR personnel to obtain and maintain HAZMAT endorsements (i.e., certifications). Federal law mandates any person driving hazardous materials maintain a HAZMAT endorsement.

Shortly after plaintiff began her employment, she met with service center manager ("SCM") Walt Holtz for her thirty-day review. Plaintiff did not raise any concerns and Holtz reported plaintiff's demeanor as "positive." As SCM, Holtz typically was on the job site by 6 or 7 a.m. and remained there throughout the day.

In approximately August or September of 2020, plaintiff began driving "the Cranberry" route for XPO. In order to provide plaintiff with guidance and advice for best practices, service manager Mark Seftas gave her the telephone number of Charles Ward, another DSR familiar with the route. Plaintiff reached out to Ward and he immediately began making suggestive comments to plaintiff.

In September or October of 2020, plaintiff orally informed Holtz that Ward repeatedly had made unwanted advances towards her. She relayed that despite unequivocally rejecting him numerous times, Ward remained persistent and began making increasingly salacious offers. Ward communicated to plaintiff that he would like to purchase a 120-inch television so he and plaintiff could watch pornography together while they cuddled on his couch. Plaintiff responded by stating she was involved with the father of her daughter and remained uninterested. Undeterred, Ward invited her to bring her children with her and offered the babysitting services of his daughter so that he and plaintiff could watch pornography undisturbed. Finally, plaintiff relayed to Holtz that Ward proclaimed he could last several rounds of sex with plaintiff.

Holtz indicated he would investigate the matter and speak with Ward. Holtz's investigation amounted to speaking with both plaintiff and Ward to obtain their personal recollections. In doing so, Holtz wanted to confirm that plaintiff was not just misunderstanding playful flirtation and/or rule out that she was not inviting the advances. Holtz, in concert with XPO policy, determined that the appropriate disciplinary action was a "formal coaching and entry into [Ward's] file that any further actions of this instance would result in further discipline." Doc. No. 53-1, at 3.

Ward's conduct towards plaintiff did not decrease after the formal coaching. Throughout the fall of 2020 and until Ward left XPO in February of 2022, Ward continued to make lewd and suggestive comments to plaintiff at the loading dock and whenever they spoke on the phone. Plaintiff voiced concern to supervisory and Human Relations personnel Jason Darocha, Jonathan Marafiote, and Marissa Wiley. Further, numerous witnesses observed and overheard Ward make these statements to plaintiff and encroach her personal space on the dock. Defendant, however, insisted on the production of "actual evidence" such as a text or email to overcome a "he said,

she said" situation. As Holtz testified, defendant's supervisors would not make a credibility determination between the two parties.

According to Senior Human Relations ("HR") generalist Judith Key, defendant maintained an "open door policy" concerning workplace harassment. Under this policy, employees were told they could go to anyone if they had a concern. For example, an employee could lodge a complaint with a supervisor, their service center manager, or a member of HR, such as Key herself. Further, the employees could go to the HR member above her, Jonathan Marafiote, or make a report on defendant's compliance hotline. Key further elaborated that if a complaint were filed, she would open an investigation, conduct interviews, write a memo of the interviews, and draft a case summary. The information would then be forwarded to her boss, Marafiote, who would review the record in its entirety. Defendant's supervisory and HR employees all stressed that XPO policy required corroborating evidence to overcome a "he said, she said" scenario.

In approximately August of 2021, Marty Usko began harassing plaintiff. Plaintiff testified that Usko would routinely pull her hair, invade her personal space, and whisper in her ear "mmhm, you smell good today," or "mmhm, you look good today." Further, Usko repeatedly told plaintiff that "[he] wanted to tie [her] up like a farm animal [and] tickle [her] bum with a feather." Doc. No. 47-1 at 37. Plaintiff reported this to her afternoon shift dispatcher, Seftas, several times. Seftas witnessed Usko's interactions with plaintiff on occasion.

On April 20, 2022, plaintiff observed an XPO truck pulled over to the side of the road near Triadelphia, West Virginia. Plaintiff was unaware of the driver's identity. Concerned about whether the driver needed aid, plaintiff approached the cabin. The driver, Dallas Brown, opened the door, caressed the inside of plaintiff's leg and told her he "would like to eat that pussy."

When plaintiff rebuffed his advance, Brown quickly offered her $200 and told her "to keep your fucking mouth shut." Plaintiff refused the money. Fearing retaliation from Brown because he was a large man with a known temper, plaintiff did not immediately report this incident.

On July 7, 2022, while unloading a trailer on the dock, a driver named Thomas Keaton said he was always the one bending over and asked plaintiff when he would get to see her bend over. She quipped back that she was lazy and he was not going to see that happen.

On July 14, 2022, a fellow DSR named Joe Ross approached plaintiff and showed her a text that DSR Bill Boehme had sent him in September of 2021. The text contained a provocative image depicting the backside of an ostensibly nude woman who was bound at her hands and feet. The woman had elaborate fingernails. Accompanying the photo was Boehme's text: "think Ryann and Rachel would like to get their nails done?" With this "written evidence," plaintiff made a complaint to her supervisors.

Terminal Manager Darocha escalated the report to human resources. On July 20, 2022, Marafiote initiated an investigation by interviewing plaintiff. At this time, plaintiff reported the incident regarding Brown and also provided a written statement about the Usko, Brown, and Ross incidents. Ultimately, Marafiote concluded his investigation without finding Brown to be at fault. As to the text message, defendant's supervisors dismissed the incident as being two friends sharing a joke on private phones.

When Brown was interviewed by Darocha and Marafiote about plaintiff's initial complaint regarding the roadside incident, Brown was asked if he touched plaintiff or gave her money. Brown denied that he did either of these things or that he generally engaged in harassing conduct. Brown was not asked about whether he caressed plaintiff's leg, made a sexually explicit proposition or offered her money.

Due to her fears of Brown and her uneasiness about making the complaint against him, plaintiff asked Darocha for the day off to assure that she and Brown were not present in the workplace when the investigation occurred. Plaintiff was not permitted to be off and the two came in close contact on that day in the terminal. Brown just stared at plaintiff and shook his head in disapproval.

Sometime after the investigation, Brown called plaintiff and apologized for lying about what happened. On August 26, 2022, plaintiff informed Marafiote and Darocha of the content of the call. Darocha then wrote an email about the incident memorializing that plaintiff made the call to Brown. Defendant did not take further action about the call.

Plaintiff filed a charge of discrimination with the EEOC on December 9, 2022, alleging a sexually hostile work environment which defendant failed to stop. Plaintiff's complaint was dual-filed with the PHRC. In an email dated January 9, 2023, Seftas informed Darocha that an employee overheard plaintiff expressing concern about ongoing discrimination.

In February of 2023, plaintiff's HAZMAT certification unexpectedly lapsed when she renewed her driver's license. During the process of renewing her license, plaintiff was informed that her HAZMAT certification would transfer over with the renewal. She subsequently learned that it did not. She immediately reported the situation to defendant and completed her application with Transportation Security Agency ("TSA") to obtain the certification.

Defendant permitted plaintiff to work on the docks from February 6th through February 10th, 2023. It then informed her that without her certification, she would be placed on unpaid leave. Defendant advised she would have up to ninety days of unpaid leave to obtain her HAZMAT certification. Initially, she was given thirty days of leave and told that if she needed more, she would have to notify defendant.

When plaintiff had a valid HAZMAT certification, she rarely transported HAZMAT materials. Further, while she was working on the dock she heard two other men, Mark (last name unknown) and Thomas Keaton joking and bragging about driving without a HAZMAT certification.

When plaintiff was being forced to go on unpaid leave, she requested that she be assigned to work on the dock or drive routes that did not require the certification while TSA reviewed her application. Defendant denied her requests.

Plaintiff did not receive her certification from TSA within the 90 days. Defendant notified plaintiff the Friday before the deadline expired that she was expected to be at work on Monday (the 91st day) with her certification. When plaintiff did not appear on that date with the certification, defendant terminated plaintiff.

On June 6, 2023, the EEOC issued plaintiff a notice of the right to sue. Plaintiff filed an additional charge of discrimination with the EEOC on November 8, 2023, alleging defendant placed her on leave and subsequently terminated her in retaliation for making complaints about a sexually hostile work environment. On July 2, 2024, the EEOC issued plaintiff a notice of the right to sue.

Defendant moves for summary judgement on two grounds. First, it asserts that plaintiff's claim(s) for a hostile work environment must be separated into two distinct groups: the alleged harassment by Ward, and all the other asserted instances of harassment. In delineating between the two, defendant insists that the allegations against Ward are time barred and plaintiff has failed to demonstrate that the other harassment is severe or pervasive and/or there is a basis for *respondeat superior* liability regarding the same. Second, defendant maintains that plaintiff cannot establish a claim for retaliation because she herself allowed her HAZMAT certification to

lapse and then failed to renew it on time despite defendant granting her a leave of absence and multiple extensions.

In response, plaintiff maintains that Ward's behavior and the subsequent harassment are a continuation of the same severe and pervasive hostile work environment and defendant failed to take steps reasonably calculated to remediate it. In addition, from plaintiff's perspective the record will support a finding that defendant terminated her under the pretext of a lapsed HAZMAT certification in retaliation for her making complaints about several employees and filing a charge with the EEOC.

Title VII of the Civil Rights Act of 1964 ("Title VII") prohibits discrimination "against any individual with respect to [his or her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000 e–2(a)(1). The prohibition "not only covers 'terms' and 'conditions' in the narrow contractual sense, but 'evinces a congressional intent to strike at the entire spectrum of disparate treatment of [protected employees] in employment." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998) (quoting Meritor Savs. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986)). "Title VII is violated 'when the workplace is permeated with discriminatory [sex-based] intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Ocheltree v. Scollon Productions, Inc., 335 F.3d 325, 331 (4th Cir. 2003) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 215 (1993)). Title VII is designed to protect against "working environments [that are] so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers." Meritor, 477 U.S. at 66 (quoting Rodgers v. EEOC, 454 F.2d 234, 238 (5th Cir. 1971)).

A plaintiff alleging a sexually hostile work environment must establish the following elements: (1) the employee suffered intentional discrimination because of her sex; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of *respondeat superior* liability. Abramson v. William Paterson College of New Jersey, 260 F.3d 265, 276-77 (3d Cir. 2001). Proffering sufficient evidence to meet each element of a hostile work environment claim generally precludes summary judgment in the defendant's favor and permits the plaintiff to proceed to trial. Id. at 280-281.

Here, the record contains sufficient evidence to permit a finding that plaintiff suffered pervasive sexual harassment in the workplace. It also contains sufficient evidence to support a finding that defendant failed to take steps reasonably calculated to stop the harassment and prevent it from reoccurring. Thus, defendant is not entitled to summary judgement on this claim.

Defendant's argument that plaintiff cannot establish the second element rests on the assumption that Ward's alleged harassment and the other instances of later harassment must be placed into different buckets. Defendant reasons that when the instances of harassment are separated in this way, it becomes clear that the claim about Ward's behavior is time-barred and the other instances of harassment fail to meet the severe or pervasive element. This is unpersuasive.

Defendant's contentions that plaintiff was required to file a harassment claim within 300 days of the last harassment by Ward is misplaced. Defendant has not shown that Ward's conduct created a discrete form of disparate treatment discrimination that was actionable; nor has it shown that Ward's conduct was itself independently actionable against defendant as a hostile

work environment claim. In other words, defendant 1) misinterprets the nature of a hostile work environment claim, 2) fails to establish that Ward's conduct gave rise to a claim for sexual harassment that independently was actionable, and/or 3) fails to establish that plaintiff had a duty to file a complaint based on Ward's behavior or lose the right to complain about it as part of the environment as a whole. As a result, defendant has failed to establish that Ward's harassment must be separated from the other instances of harassment.

The Supreme Court has considered and rejected the notion that, in the absence of distinct claims for disparate treatment, the segments of a hostile work environment claim are to be analyzed separately for timeliness. National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 115-117 (2002). This is because a hostile work environment claim "is composed of a series of separate acts that collectively constitute one unlawful employment practice and cannot be said to occur on any particular day." National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 115-117 (2002).

The Supreme Court has made clear that because a hostile work environment is by its nature a continuing violation, "[i]n order for the charge to be timely, the employee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment." Id. at 118. To further demonstrate this point it opined:

> (1) Acts on days 1-400 create a hostile work environment. The employee files the charge on day 401. Can the employee recover for that part of the hostile work environment that occurred in the first 100 days? (2) Acts contribute to a hostile environment on days 1-100 and on day 401, but there are no acts between days 101-400. Can the act occurring on day 401 pull the other acts in for the purposes of liability? In truth, all other things being equal, there is little difference between the two scenarios as a hostile environment constitutes one "unlawful employment practice" and it does not matter whether nothing occurred within the intervening 301 days so long as each act is part of the whole. Nor, if sufficient activity occurred by day 100 to make out a claim, does it matter that the employee knows on that day that an actionable claim has happened; on day 401 all incidents are still part of the same claim. On the other hand, if an act on day 401 had no relation to the acts between days 1-100, or for some other reason, such as certain

> intervening action by the employer, was no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts, at least not by reference to the day 401 act.

Id. In other words, as long as any of the constituent acts were part of the same hostile environment, they remain within the scope of any timely filing of that single unlawful employment practice.

Given the nature of the unlawful employment practice at issue, defendant's attempt to separate Ward's alleged harassment from the other instances that form the basis of plaintiff's hostile work environment claim is unavailing. Defendant appears to conflate the timeliness of a hostile work environment claim with that of a disparate treatment claim. But plaintiff does not seek to prove and defendant has failed to identify any materially adverse employment action that occurred in conjunction with Ward's conduct. Instead, she present's Ward's conduct as a part of an ongoing environment of hostility. And there is no dispute that the last act of asserted hostility contributing to the environment occurred within 180 days of the filing of plaintiff's EEOC complaint. It follows that the use of Ward's conduct is not untimely merely because it occurred at an earlier date.

Defendant nevertheless maintains that Ward's conduct was distinct and separate from the other instances. But it fails to provide any persuasive reason for such treatment and, more to the point, plaintiff's reliance on Ward's behavior in support of her claim is consistent with the controlling precedent.

In Morgan, the Court cautioned against segmenting the incidents comprising a hostile work environment claim into separate groupings for either timeliness or liability. It further opined:

> It is precisely because the entire hostile work environment encompasses a single unlawful employment practice that we do not hold, as have some of the Circuits, that the plaintiff

> may not base a suit on individual acts that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on such conduct. The statute does not separate individual acts that are part of the hostile environment claim from the whole for the purposes of timely filing and liability. And the statute does not contain a requirement that the employee file a charge prior to 180 or 300 days "after" the single unlawful practice "occurred." Given, therefore, that the incidents constituting a hostile work environment are part of one unlawful employment practice, the employer may be liable for all acts that are part of this single claim. In order for the charge to be timely, the **e**mployee need only file a charge within 180 or 300 days of any act that is part of the hostile work environment.

Morgan, 536 U.S. at 117-18. And our court of appeals reiterated these same concerns in West v. City of Philadelphia, 45 F.3d 744 (3d Cir. 1995). There, in reversing the district court's ruling that the plaintiff's evidence of a hostile work environment was limited to the incidents occurring within 300 days of the filing of the complaint or otherwise to a showing it was committed by the same asserted harasser, the court opined:

> To prove a hostile work environment, West had the burden of establishing that he suffered intentional, pervasive, and regular racial discrimination of which PECO supervisors and management were aware and which PECO permitted to continue. Nowhere in the case law establishing these standards is there a requirement that the discriminatory conduct of each co-worker, who participated in creating the hostile environment, be pervasive and/or on-going. We believe that West proffered sufficient evidence to demonstrate that the hostile environment was on-going. Once he had done so, evidence of incidents of pre–300–day discriminatory activity was admissible if the incidents were related to the overall hostile environment.
>
> * * *
>
> The "totality" approach cannot support the "same actor" or "same form of discrimination" requirements imposed at trial here. Because a hostile work environment claim is a single cause of action, rather than a sum of discrete claims, each to be judged independently, the focus is the work atmosphere as a whole. If an employer knowingly (actually or constructively) permits a hostile work environment to exist, it is of no import that the collection of incidents comprising the claim were committed by a variety of individuals.

Id. at 756.

Moreover, "[u]nder the continuing violation doctrine, discriminatory acts that are not individually actionable may be aggregated to make out a hostile work environment claim [and]

such acts 'can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period.'" Mandel v. M&Q Packaging Corp., 706 F.3d 157, 165 (3d Cir. 2013) (quoting O'Connor v. City of Newark, 440 F.3d 125, 127 (3d Cir. 2006)). And in distinguishing between incidents that reflect isolated episodes of discrimination from those that are actionable as a persistent, ongoing pattern, examining whether the episodes are sufficiently linked through their subject matter, frequency and similarity provide non-exclusive guideposts from which to determine whether the incidents can be used as component parts of a hostile work environment claim. Mandel, 706 F.3d at 167.

So from a timing perspective, a defendant cannot at its whim separate out the individual acts its employees are alleged to have committed from the whole in order to prevent a plaintiff from pursuing or establishing a hostile work environment claim. The statute does not separate the individual acts that are part of the whole and it does not require that an employee file a charge prior to 180 or 300 days after the single unlawful practice has occurred. Morgan, 535 U.S. at 118; West, 45 F.3d at 756 ("Finally, the [on going hostile work] harassment did not cause a discrete event such as a lost job or a denied promotion and, thus, it did not trigger a duty of the plaintiff to assert his rights arising from that deprivation."). And from a liability perspective, a plaintiff may rely on episodes that are sufficiently linked through their subject matter, frequency and similarity to form the component parts of a hostile work environment claim.

In this instance, plaintiff does not attempt to recover from defendant for a specific acute harm suffered from Ward's actions. Instead, she presents Ward's harassment as a part of a larger tapestry of ongoing hostility in the work environment. Using his conduct in this way is not time barred because plaintiff did file her claim within 180 days of at least one of the incidents forming the basis for proving a persistent, ongoing pattern of hostility. And Ward's conduct and the other

incidents are sufficiently linked from a liability perspective: all of the conduct involves other male employees approaching plaintiff for sex and/or treating her as a sex object and/or harassing her because of her sexual appeal; the incidents occurred at intervals spanning the entire three-year period she worked for defendant; and they reflect the same or similar forms of hostility based on sex. Consequently, plaintiff may present Ward's harassment as evidence of her hostile work environment claim.

Defendant's contention that plaintiff lacks sufficient evidence to permit a factfinder to determine that the harassment was pervasive suffers from similar shortcomings. In general, the Supreme Court's cases in this area have taken "a middle path between making actionable conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." Harris, 510 U.S. at 21. Striking such a balance is necessary to maintain the distinction between objectively hostile or abusive work environments that violate Title VII's broad rule of workplace equality and simple teasing, offhand comments and isolated incidents that are beyond its reach. Id.; Clark County v. Breeden, 532 U.S. 268, 271 (2001).

The Supreme Court has emphasized that the standards for judging hostility must remain sufficiently demanding so that Title VII does not become "a general civility code." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). It has reiterated that "sexual harassment is actionable under Title VII only if it is so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment." Clark County, 121 S.Ct. 1509; Meritor, 477 U.S. at 67. Conduct which amounts to the "ordinary tribulations of the workplace" such as sporadic use of abusive language, off-handed jokes and occasional taunting and teasing is beyond the purview of Title VII. Faragher, 524 U.S. at 788. Conduct becomes

actionable only where it has become sufficiently "extreme to amount to a change in the terms and conditions of employment." Faragher, 524 U.S. at 788.

All of the circumstances surrounding the asserted hostile conduct are to be examined in determining whether a work environment is sufficiently severe or pervasive. See Harris, 510 U.S. at 23. The court should assess the objective severity of the harassment and can consider (1) its frequency, (2) its severity, (3) whether it is physically threatening or humiliating (as opposed to an offensive utterance), (4) whether it unreasonably interferes with the employee's work performance and (5) the effect on the employee's psychological well-being. Id.; Moody v. Atlantic City Board of Educ., 870 F.3d 206, 214 (3d Cir. 2017) ("The question of 'whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'") (quoting Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 270-71 (2001)). It is the totality of the circumstances that is critical and no single factor is required or dispositive. Faragher, 524 U.S. at 788. As the Court has opined:

> [t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts ... to distinguish between simple teasing or roughhousing ... and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

Oncale, 523 U.S. at 81-82; accord Abramson, 260 F.3d at 279-80 (pervasive requirement is satisfied where the evidence on the environment as a whole "can be found to aggregate to create an environment hostile to a person [sharing the plaintiff's protected trait].") (citing in support Durham Life Ins. Co., 166 F.3d 155).

Moreover, the severity of the asserted conduct must be considered. Ordinarily, isolated incidents of offensive conduct do not rise to level of actionable conduct. Castleberry v. STI Group, 863 F.3d 259, 264 (3d Cir. 2017) (citing Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006)). Nevertheless, the Supreme Court's precedent makes clear that "the correct standard is "severe *or* pervasive." Id. (emphasis in original). These are "alternative possibilities." Id. In other words, "some harassment may be severe enough to contaminate an environment even if not pervasive; other, less objectionable, conduct will contaminate the workplace only if it is pervasive.” Id. (quoting Jensen, 435 F.3d at 449 n. 3). Thus, isolated incidents or even a single incident of discriminatory treatment can satisfy the "severe or pervasive" requirement where the conduct is sufficient to amount to a change in the terms and conditions of employment. Id.

When considered under the above standards, plaintiff's evidence falls well above the threshold needed to proceed to trial. Ward's harassing conduct began approximately one month into plaintiff's employment and it continued from the late summer of 2020 until Ward's departure in February of 2022. Ward repeatedly made unwanted sexual advances to plaintiff. Despite having his advances continuously rebuffed, Ward made progressively more aggressive and provocative statements to plaintiff. He told her that he wanted to watch pornography with her on his couch, he "could last several rounds" with her and he envisioned her in provocative sexual positions. Ward even encouraged plaintiff to bring her children to his house so his daughter could watch them and then he and plaintiff could watch porn together.

Plaintiff sought to end the harassment by lodging an oral complaint with her service center manager. The ensuing investigation conducted by Holtz consisted of interviewing Ward and plaintiff. As part of the process Holtz asked plaintiff whether she had misinterpreted Ward's conduct or had flirtatiously invited the advances. And although Holtz told plaintiff that he found

her to be credible, he concluded by informing her that without corroborating evidence, under defendant's policy all he could do was issue Ward a formal coaching. There is evidence from others who worked with plaintiff that this did not deter Ward and the harassment continued until Ward's employment ended in February of 2022.

Around August of 2021, Usko began harassing plaintiff. He routinely pulled her hair, invaded her personal space, and provocatively whispered in her ear. Usko repeatedly told plaintiff that he wanted to tie her up like a farm animal and tickle her salaciously with a feather. Plaintiff again reported this conduct, this time to her afternoon shift dispatcher, Seftas.

On April 20, 2022, plaintiff stopped to offer assistance (if needed) to a fellow DRS driver who was pulled over on the side of the road. The encounter quickly turned into plaintiff being touched inappropriately in a sexual nature and a crass statement being made. When rebuffed, the offender offered plaintiff money and told her not to say anything about the encounter. Plaintiff did not immediately report this incident because she feared the perpetrator.

Finally, in July of 2022, a fellow DSR showed plaintiff a lascivious text message with sexually charged imagery. The message had been shared among at least three of plaintiff's coworkers and contained an inquiry implying plaintiff would like to engage in the same behavior. With the message as corroborating evidence, plaintiff logged another complaint. Darocha handled the initial complaint and brought a member of HR, Marafiote, in on the matter. Marafiote interviewed plaintiff and she then informed him about the Usko and Brown incidents. Marafiote then interviewed Brown and Brown at that point denied the allegations as false.

Ultimately, defendant once again found the Usko and Brown claims to be based on a "he said, she said" scenario without corroborating evidence and dismissed them. As to the salacious text, defendant dismissed that as two buddies having a laugh over a text on personal time.

Of course, in isolation each of these instances could be construed as the actions of separate actors that in combination lack the severity to carry the day on a workplace harassment claim. But the analysis does not focus on the differences between the actors and their conduct or the timing of their behavior as it relates to that of the others engaging in such behavior. Andrews, 895 F.2d at 1485; West, 45 F.3d at 756. Instead, the focus is on the whole or sum total of the work environment. West, 45 F.3d at 756 (citing Andrews, 895 F.2d at 1485). And taken together, the record will support a fact finder determining that plaintiff was being subjected to sexually charged harassment that was ongoing and persistent. In other words, the jury may well conclude that the evidence depicts an environment wherein plaintiff suffered fairly continuous harassment from many angles for nearly three years. And when she sought relief or protection, her superiors investigated the matter under company policy – they interviewed each party and then based on that policy they consistently denied her claims as uncorroborated "he said, she said" claims.

Additionally, the record will support a finding that defendant tacitly inculcated an environment in which the employees believed they could sexually harass plaintiff with little or no repercussions. Plaintiff was the only woman on the dock. As plaintiff testified, her harassment was not done in seclusion. To the contrary, in many instances she was harassed in plain sight of other dock employees. Employees routinely witnessed the crass treatment of plaintiff and heard Ward and Usko speak to her lasciviously. Her complaints were persistently dismissed for lack of corroborating evidence. Treatment of the complaints in this manner may well be viewed by the trier of fact as facilitating the likelihood of further harassment. Cf. West, 45 F.3d at 756 ("Rather, by implicitly condoning harassing behavior, the employer may facilitate its spread by a greater number of harassing employees."). And this in turn may persuade the jury

that plaintiff's account of ongoing harassment is to be credited. In other words, the finder of fact may well conclude that the harassment for the most part continued unabated and it and the lack of meaningful discipline caused plaintiff to feel evermore isolated; and it enhanced the discomfort and distress she was experiencing from the harassment. All of which can be found to have contributed to the severity and pervasiveness of the harassment.

The record as a whole will support a finding that plaintiff suffered sexually charged workplace harassment that was ongoing and persistent. For approximately three years she endured harassment from several individuals. When she reported the harassment, defendant conducted what can be found to be superficial investigations and repeatedly dismissed the incidents as uncorroborated "he said, she said." And more harassment by the same individuals followed. Consequently, the evidence will support a finding that defendant subjected plaintiff to a workplace that contained sexually charged harassment that was sufficiently severe or pervasive to alter the conditions of plaintiff's employment and create an abusive working environment.

Turning to the fifth element, the evidentiary record will permit the finder of fact to determine that defendant knew or should have known about the ongoing harassment and failed to take remedial action effectively calculated to stop it. As a result, there is a sufficient basis to establish *respondeat superior* liability.

Defendant maintains that it promptly investigated all complaints and the harassing behavior plaintiff brought to its attention and it pursued the investigations to their logical end. It imposed discipline in the instances where plaintiff made a formal complaint and she did not report further harassment from those individuals. Thus, it argues that it is entitled to summary judgment because the record shows as a matter of law its responses were reasonably calculated to prevent future harassment. We disagree.

"Employers may be liable for either a supervisor's or a co-worker's discriminatory acts." In re Tribune Media Co., 902 F.3d 384, 399 (3d Cir. 2018). When a hostile work environment is created by a non-supervising employee, such as a co-worker, the employer is vicariously liable only if the employer was negligent in controlling working conditions. Vance v. Ball State Univ., 570 U.S. 421, 424 (2013); Huston v. Procter & Gamble Paper Products Corp., 568 F.3d 100, 104 (3d Cir. 2009). In general, "employer liability for co-worker harassment exists only if the employer failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." Huston, 568 F.3d at 105.

In cases based on co-worker harassment, "an employer is directly, not vicariously, liable for its negligent response to knowledge of sexual harassment by co-workers and the term *respondeat superior* may thus not be accurate; rather, in this context, '*respondeat superior*' . . . connotes notice to the employer." Id. at 104 n. 3 (citing Kunin v. Sears Roebuck and Co., 175 F.3d 289, 293 n. 5 (3d Cir. 1999)). In contrast to the affirmative defense governing harassment by a supervisor, the employee has the burden of proving the negligence needed to establish vicarious liability for co-worker harassment. Andrews, 895 F.2d at 1482; Kunin, 175 F.3d at 294; Moore v. City of Philadelphia, 461 F.3d 331, 349 (3d Cir. 2006); Vance, 570 U.S. at 443.

Here, all of the harassment came from non-supervising employees. And plaintiff does not specifically contend that defendant failed to provide an avenue for complaint. As a result, plaintiff bears the burden of establishing that defendant is liable because it knew or should have known of the harassment and failed to take remedial action reasonably calculated to end it. The evidentiary record will support a finding in plaintiff's favor as to these requirements and as a result defendant may be found to have been negligent.

Defendant places significant stock in the fact that it did investigate each of plaintiff's formal complaints and asserts it took "remedial action" where its investigations suggested such measures were warranted. And plaintiff did not continue to complain about each particular co-worker's behavior and admits there was no further harassment by Boehme, Brown or Keaton after she made a formal complaint about them. As a result, defendant argues that plaintiff is merely quibbling with the remedial actions defendant chose to implement and it is relieved of liability.

But this approach once again attempts to isolate the incidents of harassment into discrete and unrelated segments and fails to account for the breadth of notice plaintiff may be able to establish at trial under the applicable standards. It also fails to acknowledge that as to the evidence plaintiff can present regarding Ward and Usko, the finder of fact may be convinced that the harassment continued unabated notwithstanding plaintiff's formal reports. Likewise, the jury will be able to infer that defendant's approach to plaintiff's formal complaints created an atmosphere where plaintiff's co-workers believed nothing serious would result from their on-going harassing behavior. It is the combination of these facts and inferences that provide the foundation for the jury to pass on whether defendant was negligent in a manner that fostered ongoing and reasonably foreseeable harassment in plaintiff's workplace.

An employee can establish "that an employer knew or should have known about workplace sexual harassment if 'management-level employees had actual or constructive knowledge about the existence of a sexually hostile environment.'" Huston, 568 F.3d at 105 (quoting Andrews, 895 F.2d at 1486). Principles of agency law guide the assessment of whether a particular employee is a management level employee through whom knowledge may be imputed to the employer. Id. at 105-06. Both the employee's duties to the employer and the

materiality of the information delimit the knowledge that may be imputed to the employer. Id. at 107-08. To be imputed, the knowledge must be within the scope of an employee's duties and it must be material - that is important or significant - to that employee's responsibilities to the employer. Id. at 106-07.

Generally, the principles of agency law indicate that harassment may be imputed to the employer through two separate categories of employees. First, "an employee's knowledge of sexual harassment may be imputed to the employer when the employee is employed to report or respond to sexual harassment." Id. at 107. Typically, such an employee "is sufficiently senior in the employer's governing hierarchy, or otherwise in a position of administrative responsibility over employees under him, such as a departmental or plant manager, so that such knowledge is important to the employee's general managerial duties." Id. Such an employee "usually has the authority to act on behalf of the employer to stop the harassment, for example, by disciplining employees or by changing their employment status or work assignments." Id. Such an employee's knowledge of sexual harassment properly is imputed to the employer because it is significant to that employee's general mandate to manage employer resources, including human resources. Id.

"Second, an employee's knowledge of sexual harassment will be imputed to the employer where the employee is specifically employed to deal with sexual harassment." Id. Employees within this category include those who are "part of the employer's human resources, personnel, or employee relations group or department." Such employees are often designated as "a point person for receiving complaints of harassment." And such a designation provides sufficient justification for imputing knowledge within the realm of fulfilling the duty to respond to and report on sexual harassment. Id.

Knowledge may be actual or constructive. Actual knowledge is created by the employee's firsthand experience in the workplace as it relates to managing workplace matters of importance to performance of the employee's duties.

The ability to impute constructive knowledge generally has been recognized in two situations. The first is "where an employee provides management level personnel with enough information to raise a probability of sexual harassment in the mind of a reasonable employer." Kunin, 175 F.3d at 294 (citing Zimmerman v. Cook County Sheriff's Dep't, 96 F.3d 1017, 1018–19 (7th Cir. 1996)).

Constructive knowledge also may be imputed "where the harassment is so pervasive and open that a reasonable employer would have had to be aware of it." Id. This standard seeks to “strike the correct balance between protecting the rights of the employee and the employer by faulting the employer for turning a blind eye to overt signs of harassment but not requiring it to attain a level of omniscience, in the absence of actual notice, about all misconduct that may occur in the workplace.” Kunin, 175 F.3d at 294; Poe-Smith v. Epic health Services, Inc., 2017 WL 915139, *3 (D. Del. March 8, 2017) (same).

In contrast, mere oversight of a fellow employee or of workplace production by co-employees does not elevate an employee to a management level position for the purposes of imputing knowledge of sexual harassment. Huston, 568 F.3d at 108-10. Such employees may have a responsibility to manage certain work assignments in a work group or detail, but they lack the general attributes of an employee who has the authority to regulate the workplace environment. Id.

Here, the record will support a finding that defendant should have become aware that plaintiff was experiencing harassment on an ongoing and persistent basis that extended well

beyond the formal complaints made by plaintiff. Plaintiff did give notice of harassment by Ward, Brown, Usko, Boehme and Keaton. The notice was provided or conveyed to Seftas, Holtz, and Darocha, who were management-level employees present in the workplace. From there, notice was conveyed up the chain to Marafiote, Key and Tafilaw, who were higher-level supervisors within defendant's human relations department.

Furthermore, the record indicates that defendant's policy treated any oral complaint made to any manager or supervisor to be a valid and legitimate complaint. If an employee made a complaint to any supervisor, it was the supervisor's duty to report it to HR. As such, all of plaintiff's complaints were deemed by defendant to be valid complaints. And as the human relations supervisor in charge of the Pittsburgh district, all of plaintiff's complaints were reported to Marafiote, who in turn brought in Key and Tafilaw on some of the investigations. Thus, it is clear that defendant can be found to have knowledge of all the details of the harassment which plaintiff did report.

The record will also support a finding that defendant should have been aware of many additional instances of harassment. Plaintiff testified that she made repeated verbal reports about Ward's ongoing behavior to Wiley that provided details about what was happening on the dock. She emphasized that Ward's conduct often was out in the open and everyone on the dock could see Ward approaching her and initiating conversations with her out of the earshot of others. As stated by HR generalist Key, XPO employees had the ability to make a legitimate complaint to any managerial personnel. It was then the duty of the manager/supervisor to forward the complaint to HR. Given this policy, the finder of fact may well conclude that plaintiff's complaints to her immediate supervisors and foremen should have been conveyed up the chain of command and defendant should have known of Ward's ongoing harassment.

Plaintiff also made several verbal complaints to Seftas about Usko's ongoing behavior on the dock, such as personal touching and making sexually based statements. Usko corroborated this by confirming that his personal interaction with plaintiff often did occur in locations where it could be observed by others present at the dock or work site location. Seftas listened to the complaints and then directed plaintiff to return to work on the dock.

Seftas was one of the employees who fielded plaintiff's initial complaints of harassment and assisted in conveying those complaints up the management/human relations chain. What's more, defendant's anti-harassment policies established that he was a point person and it was acceptable for plaintiff to make complaints to management-level employees such as Seftas. As such, the finder of fact may consider plaintiff's follow-up complaints to Seftas and the information that was conveyed, as well as Seftas' observations of the ongoing behavior in plaintiff's workplace environment that followed those reports. See Young v. Bayer Corp., 123 F.3d 672, 675 (7th Cir. 1997) (finding it sufficient for a plaintiff to give notice to someone who reasonably should be expected to stop the harassment or refer the complaint up the chain of command to someone who can stop it) (cited with approval in Hurley, 174 F.3d at 118 n. 17); Jackson, 191 F.3d at 663 (the standard is not whether a specific employee reported all of the offensive conduct of co-workers; instead, the employee must demonstrate that the employer knew or should have known of the offending conduct and the finder of fact may consider all of the direct and circumstantial evidence that has a bearing on what the employer should have known under the circumstances); Torres, 116 F.3d at 634 n. 9 ("An employer can be held liable if it had constructive notice of the harassment, that is, if officials sufficiently high in the management hierarchy should have gained knowledge of it through the exercise of reasonable care."). The information plaintiff reported to Seftas and his observations of how her co-workers

interacted with her adds an additional level of information from which the finder of fact my assess what defendant knew or should have known about the duration and degree of harassment in plaintiff's workplace.

Plaintiff also reported instances where additional information about previously reported harassment came to light and/or the harassment continued notwithstanding a prior report. This evidence as well as the pattern from the investigations defendant did conduct may well persuade the finder of fact that defendant knew or should have known about far more instances of harassment than it admits.

The record also will support a finding that plaintiff's attempts to quell the harassment by making formal complaints with defendant's management were not given more than superficial consideration; and the repeated treatment of plaintiff's complaints in this manner had the result of emboldening her harassers as well as signaling to others that they could join in the harassment with little or no repercussion. Marafiote had the responsibility of fielding and investigating the complaints from the Pittsburgh district and most if not all of plaintiff's formal complaints eventually made their way to him for formal development and resolution. Marafiote and those supervisors working under him repeatedly interviewed only plaintiff and the alleged harasser such as Ward or Usko and then concluded the situation was limited to a "he said, she said" situation. Under company policy, Marafiote then dismissed the matter or only made a notation of formal counseling in the alleged perpetrator's personnel file.

The fact finder could conclude Marafiote's insistence on independent, corroborating evidence became known as defendant's standard response to plaintiff's complaints. And once it became known that in the absence of independent evidence any inquiry would end with no repercussion or such a minimal admonishment, the finder of fact might likewise infer that the

harassers soon came to believe there was little if any reason to be concerned about further or more meaningful discipline if they continued to engage in offensive behavior. Compare Hall v. Pennsylvania Dept. of Corrections, 2006 WL 2772551, *14 (M.D. of Pa., Sept. 25, 2006 (Vanaski, J.) ("The jury could conclude that the Department's investigation was inadequate and had emboldened Baddick to persist in his discriminatory treatment. The Department's inaction cannot shield it from liability.") (citing Fuller v. City of Oakland, 47 F.3d 1522, 1528-29 (9th Cir. 1995) ("An employer whose sole action is to conclude that no harassment occurred cannot in any meaningful sense be said to have 'remedied' what happened. Denial does not constitute a remedy. Nor does the fact of investigation alone suffice; an investigation is principally a way to determine whether any remedy is needed and cannot substitute for the remedy itself.")). Should the finder of fact determine that defendant's approach fostered such ongoing harassment and lacked any deterrent effect on others, it follows that it may likewise conclude that this state of affairs constituted a form of negligence that contributed to the persistence and degree of ongoing harassment in plaintiff's workplace. See Kidd v. Pennsylvania, 1999 WL 391496, *7 (E.D. Pa. May 20, 1999) (Van Antwerpen, J.) (although defendant "investigated" each complaint of harassment the plaintiff made, material issues of fact remained as to whether the remedial action taken was “reasonably calculated to prevent further harassment” where the corrective measures consisted of “speaking with” or “counseling” the accused individuals).

The finder of fact might also conclude that the internal mechanisms of defendant's anti-harassment policy were not reasonably calculated to end or remediate the harassment that did occur and defendant's failure to take active measures to correct the deficiencies reflected negligence that contributed to the harassment plaintiff experienced. Indeed, Darocha essentially testified that in the absence of "smoking gun" evidence that was independent from and

corroborated plaintiff's account, he was not going to credit any of plaintiff's complaints. He explained that his "traditional American" upbringing prevented him from finding any credibility in plaintiff's complaints. He stated: "I don't believe any part [of plaintiff's complaint(s)] specifically. I just think from my own personal experience that it's a little far-fetched. I guess it is just from my upbringing, that I just don't think something like that would go on in the world." Doc. No. 47-1 at 123-124.

So with respect to any of plaintiff's sexual harassment complaints brought to or proceeding through Darocha, who was the terminal manager at the Cranberry terminal, the finder of fact may well conclude they were not taken at face value and meaningful investigation or efforts to corroborate plaintiff were not thoroughly explored. As defendant's investigations made clear, defendant always required corroborating evidence. And without corroborating evidence, plaintiff's only recourse was to convince defendant's investigating supervisors of her word. But as shown by his own testimony, Darocha had an innate resistance to taking a complaining female such as plaintiff at her word. And defendant's company policy of requiring corroborating evidence to move beyond a "he said, she said" situation could be found to suffer from similar shortcomings.

Given this backdrop, the finder of fact may determine that based on defendant's repeated approach, plaintiff effectively was discouraged from making formal complaints about ongoing and/or additional harassment and under the existing circumstances it was reasonable for her to forego making additional complaints about her harassers. The finder of fact could likewise believe that this state of affairs diminished the level of defendant's understanding about the workplace-generated harassment plaintiff was experiencing. It may also find that failing to judge the credibility of plaintiff and the harasser in the absence of corroborating evidence fell short of

exercising reasonable care to correct and end the harassing behavior that was known. Compare Vandergrift v. City of Philadelphia, 228 F. Supp.3d 464, 488 (E.D. Pa. 2017) (Kearney, J.) (failure to pass on the credibility of the plaintiff, the alleged harassers and the witnesses created "a genuine dispute of material fact as to whether the City properly responded to Ms. Vandegrift's harassment allegations and whether it exercised reasonable care to correct the alleged harassment."). Such findings would be more than sufficient to establish negligence on defendant's behalf.

As to the fifth element, plaintiff's burden is to produce sufficient evidence to support a finding that defendant knew or should have know of ongoing sexual harassment in the workplace and negligently failed to take measures that were reasonably calculated to stop it. She has met this burden.

Turning to retaliation, the record will support a finding that a retaliatory motive was a determinative factor in plaintiff's termination. Plaintiff's retaliation claims are governed by the tripartite McDonnell Douglas burden-shifting paradigm. See Fasold v. Justice, 409 F.3d 178 (3d Cir. 2005) (PHRA retaliation claims follow Title VII's McDonell Douglas framework). Under this paradigm, a plaintiff must first make out a *prima facie* case. Id. at 184. Once she does so, the burden shifts to the defendant to articulate a legitimate, non-discriminatory rationale for the challenged employment action. Id. If defendant articulates a non-discriminatory reason, it then becomes the plaintiff's burden to prove, by a preponderance of the evidence, that the defendant's stated reason for the challenged action is a pretext for unlawful discrimination. Id.

In this case, defendant challenges plaintiff's ability to establish a *prima facie* case or genuine issue of material fact. To establish a *prima facie* case of retaliation, plaintiff must show that (1) she engaged in a protected activity; (2) she was subject to adverse employment action;

and (3) that there is a causal connection between the protected activity and the adverse action taken against her. Fasold, 409 F.3d at 188.

Here, plaintiff has established a *prima facie* case. First, she engaged in the protected activity of reporting harassment in the workplace. Plaintiff orally registered multiple complaints against Ward and Usko. Further, plaintiff filed a couple of ethics point complaints. She later dual-filed a charge of discrimination with the EEOC and the PHRA. Second, plaintiff suffered an adverse employment action when defendant terminated her. Third, there is sufficient evidence for a factfinder to connect plaintiff's termination to her numerous complaints and the filing of a charge of harassment.

Having established a *prima facie* case, the court now turns to the second step in the McDonell Douglas framework. In response to plaintiff's *prima facie* showing of retaliation, defendant successfully carries its burden to articulate a legitimate non-discriminatory rationale for the adverse employment action.

Defendant maintains that it terminated plaintiff because she failed to renew her HAZMAT certification. In support, it notes it permitted plaintiff to work on the dock from February 6th to February 10th, and then afforded her thirty days of unpaid leave to renew her certification. In the event plaintiff did not renew her certification in that time, defendant had policies in place that permitted her to request an extension. Defendant and plaintiff agree that plaintiff failed to follow this protocol, yet defendant still granted plaintiff the full ninety-day window in which to renew her certification. Having failed to renew her certification in a timely manner, defendant terminated plaintiff. Plaintiff appealed the termination and defendant granted plaintiff a termination hearing. Plaintiff failed to attend the termination hearing, at which point

defendant made the termination final. As such, defendant has successfully articulated a non-discriminatory reason for plaintiff's termination.

Shifting the burden back to plaintiff, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes, 32 F.3d at 764. And more specifically as to a retaliation claim, the record must contain sufficient evidence from which the finder of fact can link the materially adverse action to the retaliatory animus. Moore v. City of Philadelphia, 461 F.3d 331, 346 (3d Cir. 2006). Two central factors are brough into play: (1) the "temporal proximity" between the protected activity and the alleged retaliation and (2) the existence of any "pattern of antagonism in the intervening period." Id.

Here, reviewing the record in the light most favorable to plaintiff, the record will permit a factfinder to disbelieve defendant's articulated reasons. First, the close temporal proximity between plaintiff filing her charge with the EEOC, defendant placing her on leave, and the termination directly following the expiration of the leave will support an inference that defendant utilized the certification requirement as pretext for terminating plaintiff. Plaintiff filed her EEOC complaint in December of 2022 and defendant placed her on leave without pay in February of 2023. Her termination followed on the first day following the expiration of her leave. So the timing of the events, the surrounding circumstances and the immediacy of the termination present a scenario which authorizes the jury to pass on the reasons for the adverse employment action.[1]

[1] Defendant insists that a HAZMAT certification was an unconditional requirement for maintaining employment as a DSR worker. But plaintiff may be able to proffer admissible evidence to establish that two male DSRs worked on the docks and drove without their

Second, the record will support a finding that there was a pattern of antagonism in the intervening period. Between plaintiff's filing a charge with the EEOC and her subsequent placement on leave, an email dated January 9, 2023, from Seftas to Darocha flagged and discussed an employee overhearing plaintiff expressing concern about discrimination in the workplace. Further, plaintiff requested and defendant denied that she be permitted to continue working on the dock or drive non-hazmat routes until her certification arrived; and while this first appeared to be an option, defendant's position changed and plaintiff quickly was placed on unpaid leave. And when plaintiff did not appear on one day's notice at the end of her unpaid leave, defendant terminated her. Taken in concert, these facts and circumstances provide sufficient evidence to permit a finding of a growing pattern of antagonism that will permit the finder of fact to link plaintiff's firing with her complaints and charge of discrimination.

For the reasons set forth above, defendant’s motion for summary judgment will be

---

HAZMAT certifications. In this regard hearsay statements can be considered on a motion for summary judgment only if they will be admissible at trial or are capable of being reduced to a form of admissible evidence. Stelwagon Manufacturing Co. v. Tarmac Roofing Systems, Inc., 63 F.3d 1267, 1275 n.17 (3d Cir. 1995) (citing Petruzzi's IGA Supermarkets Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1234 n.9 (3d Cir. 1993) and J.F. Fesser, Inc. v. Serv-a-portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990)). Because plaintiff may be able to establish this point through defendant's witnesses or records, plaintiff's hearsay statements may be considered. In addition, plaintiff asserts that HAZMAT certification was only required when transporting hazardous materials. According to defendant's records, only one-third or fewer transports involve hazardous materials. And defendant did permit plaintiff to work on the dock without the certification before it transferred her to unpaid leave. Given these facts, there is enough circumstantial evidence to support a factfinder in disbelieving that defendant fired plaintiff because it unequivocally required all DSRs to maintain a HAZMAT certification. And this finding of disbelief will then permit the factfinder to conclude that a retaliatory motive was a determinative factor in the termination.

denied. An appropriate order will follow.

Date: August 17, 2026

s/David Stewart Cercone
David Stewart Cercone
Senior United States District Judge

cc: Gabrielle Shaulis, Esquire
David Spear, Esquire
Terri Patak Esquire

(*Via CM/ECF Electronic Mail*)